**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARIA OCCHIOLINI**, on behalf of her minor children, **E.O.** and **L.J.**, and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**BRAINPOP LLC**,<br><br>Defendant. | Case No. 2:26-cv-04081<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Maria Occhiolini, on behalf of her minor children E.O. and L.J. (collectively, "Plaintiffs") individually and on behalf of all similarly situated persons, alleges the following against Defendant BrainPOP LLC ("Defendant" or "BrainPOP") based upon personal knowledge with respect to herself and her children and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action lawsuit on behalf of similarly situated individuals to address BrainPOP's disclosure of its students' private data. BrainPOP discloses personally identifiable information ("PII") linked to private educational records and student video viewing histories to unauthorized third parties, including at least Google LLC ("Google") and New Relic, Inc. ("New Relic").

2. BrainPOP offers plans for families to supplement traditional schooling, supplemental plans for families, teachers, schools, and school districts, and replacement plans for

home schooling and school districts.[1] BrainPOP calls itself "the best part of a learner's day—and the name millions of educators trust to create engaging, effective learning experiences that every kid loves."[2] It boasts that "[w]ith BrainPOP, students feel energized, engaged, and connected with content that feels like it was made just for them."[3]

3. BrainPOP operates, controls, and manages at least the domain "www.brainpop.com" (the "Website").

4. BrainPOP's offerings on the Website are primarily videos and related content designed for minors – students in elementary and middle school.[4] The five programs it offers are BrainPOP Jr., directed towards grades K-3 (roughly ages 5-9); BrainPOP, directed towards grades 3-8 (roughly ages 8-14); BrainPOP Science, directed towards grades 6-8 (roughly ages 11-14); BrainPOP at Home, directed towards grades K-8 (roughly ages 5-14), and BrainPOP ELL, directed towards "all grades."[5] Though the BrainPOP ELL product is directed towards "all grades," it is designed as with juvenile imagery to appeal to the same age groups as the other BrainPOP products.

5. Some students, like minor Plaintiffs E.O. and L.J., even use BrainPOP for a substantial portion of their constitutionally-guaranteed and publicly funded education.

---

[1] *How to Subscribe*, BRAINPOP, https://help.brainpop.com/hc/en-us/articles/360028195272-How-to-Subscribe (last accessed May 30, 2026) (family, home school, and teacher plans); *Explore Plans*, BRAINPOP, https://www.brainpop.com/discover/plans (last accessed June 1, 2026).
[2] *The power of joyful learning*, BRAINPOP, https://www.brainpop.com/discover (last accessed June 1, 2026).
[3] *The power of joyful learning*, supra n.2.
[4] *Explore Plans*, supra n.1.
[5] *The power of joyful learning*, supra n.2.

6. BrainPOP knowingly and intentionally designed the Website to solicit communications of private data from minor students when they used the Website, including each time they complete an assignment on BrainPOP and each time they view a video on BrainPOP.

7. Plaintiffs and Class Members who used the Website reasonably believed they were communicating only with BrainPOP, and nothing about the Website' appearance indicated that unauthorized third parties could intercept and/or record, capture, or obtain private information, communications, and PII submitted by students.

8. Unbeknownst to Plaintiffs and Class Members, BrainPOP does not keep its students' private academic information confidential. BrainPOP incorporated tracking technology provided by Google and New Relic (the "Tracking Technologies")[6] on the Website that intercept, transmit, and record the content and substance of Plaintiffs' and Class Members' private communications within password-protected spaces on the Website. Through these surreptitious Tracking Technologies, BrainPOP disclosed Plaintiffs' and Class Members' education records and video viewing histories to unauthorized third parties, including Google and New Relic, in violation of numerous laws, industry standards, and user expectations.

9. The Tracking Technologies are present on *most if not all* pages of the Website, including the pages used to view and complete academic assignments and watch educational videos. These pages impermissibly disclose private information about students' interactions with the Website, the assignments they engage with, and their school district.

[6] This includes, at least, Google Tag Manager, Google Analytics, New Relic's tracking tools, and MixPanel's tracking tools. BrainPOP uses additional tracking tools on the portions of its website which do not require student login. Because the full extent of BrainPOP's use of Tracking Technology over time is within its exclusive knowledge and control, Plaintiffs cannot allege every tracking technology and/or marketing tool that was installed on the Website during the relevant period. These additional facts will be revealed during discovery.

10. BrainPOP incorporated these Tracking Technologies on the Website to, at a minimum, track the performance of the Website, to help BrainPOP market itself, and to help BrainPOP grow its student base. BrainPOP never disclosed or obtained authorization to share Plaintiffs' and Class Members' private, identifiable data with third parties to support its own advertising goals or target them specifically with advertisements. And, even worse, these third parties were not prohibited from using Plaintiffs' and Class Members' private data for their *own* benefit. Indeed, many of these unauthorized third parties use the information obtained through their Tracking Technologies for their own purposes, including to train machine learning models that power their advertising infrastructure. Thus, once Plaintiffs' and Class Members' private communications from Website enter these advertising systems, they are subject to having their information used for advertising purposes, including to stream and show targeted advertisements served by entities other than BrainPOP.

11. This undisclosed conduct is all the more egregious given the nature of the information shared by the Website, e.g., the PII, educational records, and video viewing histories of children. Plaintiffs and Class Members would not reasonably expect this information to be disclosed or intercepted without their consent, given its private nature and the number of federal and state laws designed to protect this type of information. For instance, the Federal Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g *et seq*., prohibits any regulated entity from disclosing personally identifiable education records to an unauthorized third party; the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2701 *et seq*, was passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption, and the Children's Online Privacy Protection Act of 1998 ("COPPA"), 15 U.S.C. § 6501 *et seq*, was

enacted to children, like minor Plaintiffs E.O. and L.J., from being surveilled while using the Internet.

12. As a result of BrainPOP's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) diminution of value of their data; (iii) loss of control over their valuable data, and (iv) loss of benefit of the bargain. In addition to their damages from these injuries, Plaintiffs and Class Members are entitled to statutory damages and an injunction to stop the ongoing harm.

13. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against BrainPOP: Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; Violations of the Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. § 5701 *et seq.*; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*; and violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq.*

## II. PARTIES

***Minor Plaintiff E.O.***

14. Minor Plaintiff E.O. is a six-year-old citizen of the State of Pennsylvania residing in Delaware County.

15. Plaintiff E.O. is enrolled as a first grader in The Pennsylvania Cyber Charter School, a charter school which receives funding from the State of Pennsylvania. E.O.'s mother, Maria Occhiolini, registered E.O. to use BrainPOP approximately two years ago, when she was in kindergarten. The registration process was rushed – Ms. Occhiolini received a notification in the middle of the school day, requiring her to quickly register E.O. for BrainPOP so that E.O. could

complete an assigned lesson along with her classmates. E.O. uses the email address provided by the The Pennsylvania Cyber Charter School to login to the Website.

16. In the course of her publicly-funded schooling, E.O. has routinely used the Website to complete her academic coursework, including the routine viewing of videos on the Website. Some of the videos E.O. views are assigned by her teacher. However, E.O. has access to other videos on the Website as well, and views videos that are not part of her assigned coursework. E.O. was in Pennsylvania much of the time she spent using BrainPOP.

17. Unbeknownst to Plaintiff E.O. or her mother, Maria Occhiolini, while E.O. was communicating with BrainPOP on the Website, BrainPOP disclosed her identifiable, private data to third parties including, at least, Google and New Relic.

18. The information BrainPOP disclosed, and allowed third parties to intercept, included Plaintiff E.O.'s private history of videos viewed by E.O. on the Website, E.O.'s searches for materials to view on the Website, her status as a student of The Pennsylvania Cyber Charter School, and more.

19. Plaintiff E.O., as a minor, did not and does not have the legal capacity to authorize BrainPOP to disclose any part of her student records, video viewing history, or private communications with BrainPOP through the Website.

20. Plaintiff's mother never authorized BrainPOP to disclose any part of her E.O.'s student records, video viewing history, or private communications with BrainPOP through the Website.

21. In fact, the privacy policy of The Pennsylvania Cyber Charter School states:

> We do not sell, trade, or otherwise transfer to outside parties your personally identifiable information including phone numbers and SMS consent text messaging, except as required by law. This does not include trusted third parties who assist us in operating our website, conducting our business, or servicing you,

> so long as those parties agree to keep this information confidential. PA Cyber will only transfer required information to trusted third parties at the sole discretion of the school and the school minimizes information shared to only information required in performing contracted services.[7]

22. Plaintiff E.O. was harmed as a result of BrainPOP's conduct, including by having her privacy invaded in a highly offensive manner, loss of control over her valuable data at a young and impressionable age, and loss of benefit of the bargain.

***Minor Plaintiff L.J.***

23. Minor Plaintiff L.J. is an eleven-year-old citizen of the State of Pennsylvania residing in Delaware County.

24. Plaintiff L.J. is enrolled as a fifth grader in the Pennsylvania Cyber Charter School, a charter school funded by the State of Pennsylvania. L.J. registered herself to use BrainPOP. L.J. uses the email address provided by The Pennsylvania Cyber Charter School to login to the Website. In other words, L.J.'s mother, Maria Occhiolini, did not register L.J. to use BrainPOP.

25. In the course of her publicly-funded schooling, L.J. has routinely used the Website to complete her academic coursework, including the routine viewing of videos on the Website. Some of the videos L.J. views are assigned by her teacher. However, L.J. has access to other videos on the Website as well, and views videos that are not part of her assigned coursework. L.J. was in Pennsylvania much of the time she spent using BrainPOP.

26. Unbeknownst to Plaintiff L.J. or her mother, Maria Occhiolini, while L.J. was communicating with BrainPOP on the Website, BrainPOP disclosed her identifiable, private data to third parties, including, at least, Google and New Relic.

---

[7] *Privacy Policy*, THE PENNSYLVANIA CYBER CHARTER SCHOOL, https://pacyber.org/privacy-policy (last accessed June 1, 2026).

27. The information BrainPOP disclosed, and allowed third parties to intercept, included Plaintiff L.J.'s private history of videos viewed by L.J. on the Website, L.J.'s searches for materials to view on the Website, her status as a student of The Pennsylvania Cyber Charter School, and more.

28. Plaintiff L.J., as a minor, did not and does not have the legal capacity to authorize BrainPOP to disclose any part of her student records, video viewing history, or private communications with BrainPOP through the Website.

29. Plaintiff's mother never authorized BrainPOP to disclose any part of her L.J.'s student records, video viewing history, or private communications with BrainPOP through the Website.

30. In fact, the privacy policy of The Pennsylvania Cyber Charter School states:

> We do not sell, trade, or otherwise transfer to outside parties your personally identifiable information including phone numbers and SMS consent text messaging, except as required by law. This does not include trusted third parties who assist us in operating our website, conducting our business, or servicing you, so long as those parties agree to keep this information confidential. PA Cyber will only transfer required information to trusted third parties at the sole discretion of the school and the school minimizes information shared to only information required in performing contracted services.[8]

31. Plaintiff L.J. was harmed as a result of BrainPOP's conduct, including by having her privacy invaded in a highly offensive manner, loss of control over her valuable data at a young and impressionable age, and loss of benefit of the bargain.

***Defendant BrainPOP***

32. BrainPOP LLC is a Delaware limited liability corporation with its principal place of business located at 71 W 23rd St., 17th Fl., New York, NY 10010, in New York County. Upon

---

[8] *Privacy Policy*, THE PENNSYLVANIA CYBER CHARTER SCHOOL, https://pacyber.org/privacy-policy (last accessed June 1, 2026).

information and belief, BrainPOP is wholly owned by a Danish company, Kirkbi A/S.[9] Accordingly, BrainPOP is likely a citizen of one or more of the following: Delaware, New York, and Denmark.

## III. JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a Pennsylvania, whereas BrainPOP is likely a citizen of Delaware, New York, and/or Denmark. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts claims for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511 and the VPPA, 18 U.S.C. § 2710, *et seq*.

34. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

35. This Court has personal jurisdiction over BrainPOP because it has made or established contacts in the State of Pennsylvania and in this judicial district sufficient to permit the exercise of personal jurisdiction, and Plaintiffs' cause of action arises out of BrainPOP's contacts within the State. In particular, upon information and belief, BrainPOP has a contract with The Pennsylvania Cyber Charter School, and Plaintiffs' cause of action arises out of Plaintiffs' use of BrainPOP under that contract. In addition, Plaintiffs E.O. and L.J. are Pennsylvania citizens, they

---

[9] *See* Mollenkamp, *Lego's Parent Company Acquires Edtech Firm BrainPOP*, EDSURGE (Oct. 11, 2022) available at https://www.edsurge.com/news/2022-10-11-lego-s-parent-company-acquires-edtech-firm-brainpop; *Kirkbi*, WIKIPEDIA, https://en.wikipedia.org/wiki/Kirkbi (last visited May 29, 2026).

used BrainPOP while located in Pennsylvania, and they were Pennsylvania citizens when they registered to use BrainPOP.

36. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. THE BRAINPOP WEBSITE

37. Founded in 1999, BrainPOP is a private, for-profit, educational company that offers both online courses directed towards elementary and middle school students. “At the heart of every BrainPOP lesson is a movie.”[10]

38. BrainPOP operates and manages the BrainPOP website at “www.BrainPOP.com,” which, among other things, allows prospective customers to learn more about the content BrainPOP offers and hosts the BrainPOP movies and other BrainPOP lesson related content.

39. All students who use BrainPOP have login-controlled access to the student web portal on brainpop.com, where they can view their lesson assignments, the videos at the heart of their lessons, and other activities. BrainPOP offers various login mechanisms, including a username and password, authenticating with a Google account, authenticating with Clever, and authenticating using a code. Plaintiffs and Class Members reasonably expected the information on this login-protected portal to remain private.

40. From this web portal, students can access their class assignments including the movies at the heart of their lessons and related content.

[10] *Grades 3-8*, BRAINPOP, https://www.brainpop.com/classroom-solutions/products/brainpop (last visited June 1, 2026).

41. Unbeknownst to current and past students, BrainPOP secretly embedded Tracking Technologies on the Website, allowing the interception of their students' PII and sensitive education records and video viewing histories.

42. BrainPOP knowingly and intentionally incorporated Tracking Technologies on the Website for the purposes of disclosing its users' private communications to third parties, including Google and New Relic, so that it could use the advertising services offered by these third parties to serve targeted advertisements to Plaintiffs and their parents (e.g., to encourage students to take more classes and parents to enroll more students), and others like them (e.g., known as "lookalikes" who are prospective BrainPOP users) and, consequentially, make more money.

43. As the owner and operator of the Website, BrainPOP had control over the technology it incorporated, and whether it used third parties' Tracking Technologies.

44. BrainPOP knew at the time it incorporated the Tracking Technologies on the Website that they would result in the disclosure of users' private communications to third parties by virtue of the Tracking Technologies' purpose, how they function, and the analytics and advertising services BrainPOP received as a result.

45. For instance, Google provides web property and app operators that use its tracking technology (like BrainPOP) with access to the data collected from their users and provides them with tools and analytics to leverage that information, including through Google Ads, to reach not only those specific individuals but others like them whom Google identifies based on its vast internal array of profiling data collected from both Google owned and operated web properties (e.g., Google Maps, YouTube, Google.com) and others that incorporate Google's tracking technology. In addition, Google Analytics provides powerful tools to track users' interactions with a website and the performance of the site.

46. New Relic collects data from the user interface and feeds it into its AI engines. New Relic uses the data it collects "for research and development purposes," "to increase engagement and adoption of [its] Services," "for marketing purposes," "for purposes of targeted advertising," and "to link or combine information about you with other Personal Data."[11] [12]

47. BrainPOP also sends information to Mixpanel. But, in stark contrast to Google and New Relic, Mixpanel holds itself out as an agent of its customers. Mixpanel is also AI enabled. But it protects user privacy with "a governance layer that" "gives admins control over the events AI can query" and "ensures AI is grounded in approved data." [13] Moreover, OpenAI, Mixpanel's AI vendor, "is contractually prohibited from using the data you submit and the responses you receive to fine-tune or improve OpenAI's models or service for OpenAI's purpose[s]," and similarly Mixpanel does not, by default, use customer data to improve its AI models.[14] BrainPOP's use of Mixpanel is, to the best of Plaintiffs' knowledge, legal and permissible.

48. BrainPOP knew, from these analytics, precisely what type of data it was allowing to be intercepted through these technologies it incorporated on the Website. BrainPOP also knew, and intended to disclose their data, because it was BrainPOP who configured the Tracking Technologies to send data specific from the Website to these third parties, including the name of every video viewed by a student, the student's interactions with their coursework, and more.

---

[11] *New Relic Services Data Privacy Notice*, NEW RELIC, https://newrelic.com/termsandconditions/services-notices (last accessed June 1, 2026).

[12] *General Data Privacy Notice*, NEW RELIC, https://newrelic.com/termsandconditions/privacy (last accessed June 2, 2026).

[13] *Privacy Program: An Overview of Mixpanel's Generative AI Features*, MIXPANEL, https://mixpanel.com/legal/gen-ai-features/ (last accessed June 1, 2026).

[14] *Id*.

49. BrainPOP intentionally continues to disclose its users' private communications through its incorporation of these types of Tracking Technologies on the Website, despite the privacy harm it caused and continues to cause to Plaintiffs and Class Members.

## B. BACKGROUND ON TRACKING TECHNOLOGY

50. Pixels are one of the more common forms of tracking technology used by website operators to track users' behavior, interactions, and the content of their communications online.

51. Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property.

52. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

53. Website owners, like BrainPOP, can use pixels to send additional information specific to their website. As described herein, BrainPOP configured the pixels at issue in this case to transmit and intercept students' private records, including course assignments and their video viewing histories, alongside personally identifiable information.

54. As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data:[15]

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns . . . Another is that companies can monetize the data collected[.]

---

[15] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Mar. 3, 2026).

55. Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[16]

56. As described in the sections below, BrainPOP makes extensive use of Google Analytics, Google's tracking tool. Google is especially problematic because it is of the largest advertising platforms in the world. Google uses the intercepted information for its own commercial purposes, including augmenting the profiles it maintains about individuals and improve its technology for targeting individuals with ads both on properties Google owns and operates and other web properties that participate in its ad networks.

### C. GOOGLE'S TRACKING TECHNOLOGY

57. Google is one of the largest digital advertiser platforms in the country, with a market capitalization of over $3 trillion dollars. Google accounts for 26.8% of the total digital advertising revenue generated in the United States.[17] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[18]

---

[16] *Id.*

[17] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[18] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 23, 2025).

58. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [19]

59. Google offers various tracking technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

60. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[20]

61. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code contemporaneously intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

62. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie

---

[19] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

[20] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).

values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identity individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[21]

63. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

64. In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data BrainPOP disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements to children and their

[21] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

parents. And individual consumers who have their data disclosed by one entity (for instance, BrainPOP) will see ads for other entities based on their data as a result of Google's advertising system.

65. Further, customers like BrainPOP can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like BrainPOP to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

### D. THE DATA BRAINPOP DISCLOSED UNIQUELY IDENTIFIED EACH SPECIFIC CLASS MEMBER, INCLUDING PLAINTIFFS

66. Google and New Relic provide customers like BrainPOP with one or more unique identifiers precisely so each individual whose data is sent through the Tracking Technologies can be identified and targeted. For example, customers like BrainPOP can send data to Google including its "cid," "sid," and "tid" identifiers. These identifiers all serve the same purpose—to uniquely track and identify consumers.

67. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Through these identifiers, Google knows which specific person is associated with its unique identifiers.

68. But this is not all BrainPOP disclosed. Google and New Relic also obtained Plaintiffs' and Class Members' IP addresses, which are also used to identify individual consumers. For instance, Google uses consumers' IP addresses, either alone or in combination with other information, to match and identify each individual whose data it receives through its Tracking Technology.

69. Google in particular is able to identify individuals who have Google accounts. A remarkable number of Americans possess a Google account – over one-third of Americans have accounts with Google's Gmail e-mail client; over 80-percent of Americans use YouTube, Google's video client.[22] When these users visit a website, like the Website, that utilizes these companies' Tracking Technologies, any information collected by the Pixels can be linked to the user's respective accounts with these entities through identifiers and other means.

70. Finally, BrainPOP made it particularly easy for Google to identify, target, and monetize Plaintiffs' and Class Members' data because it opted to send their private information alongside Google's preferred form of personally identifiable information: its "cid" identifier.

### E. BRAINPOP DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO UNAUTHORIZED THIRD PARTIES

71. BrainPOP incorporated Tracking Technologies on the Website, including at least Google, Meta, TikTok, and Snapchat. Through these Tracking Technologies, BrainPOP disclosed Plaintiffs' and Class Members' private communications to these third parties, as well as identifiable information, including their email addresses, unique user and device identifiers, digital fingerprint, and IP Addresses. The subsections, below, provide examples of the interception of Plaintiffs' and Class Members' data from Website.

[22] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

**i. BrainPOP's Use of the Tracking Technologies**

72. To access BrainPOP lessons, Plaintiffs and Class Members were required to use the Website to view their courses, access their assignment lists, and complete their lessons.

73. Unbeknownst to Plaintiffs and Class Members, BrainPOP intentionally configured the Tracking Technologies on the login-protected portions of the Website to capture and transmit Plaintiffs' and Class Members' communications to third parties.

74. For instance, BrainPOP allows Google to begin intercepting Plaintiffs' and Class Members' private data from the moment they log on to the Website. Google receives the students' IP address, browser information, and the unique "cid" cookie that Google uses to uniquely identify each student in its own systems, as well as full-string URLs reflecting that the student has logged into the BrainPOP website via the "dl" and "dr" field.

75. Figures 1-4 depict examples of network transmissions made to BrainPOP to Google from the Website. As these Figures demonstrate, when BrainPOP students perform routine tasks on BrainPOP, such as logging in, checking their assignments, or viewing their assigned lessons, the information BrainPOP intercepted and disclosed to Google includes, the student's "cid" Google identifier and a series of actions taken by the student.

| | |
|---|---|
| cid | 97180544.1774379879 |

…

| | |
|---|---|
| uid | eb91369e-fdb3-4536-b165-ff8ae9213720 |
| sid | 1774379880 |

…

| | |
|---|---|
| dl | https://jr.brainpop.com/ |
| dr | https://jr.brainpop.com/login/?t=e273e292b0e53066a37943b3bc399fb3f6d0f46cb4447f8aa1b105feb1c1b7c99a8e1357390ab7bc2a25e2742aa7cfb1ad8e0f953fd401065df0ccedd970987082e1897089fbc67edb0591ddd0885dea54bf5f200c4fde949597d7f56cc6ce2681cdd1a0797392ccafa371a9dc3dfdeadec328123a3c97394cd93f5dc1149e480aebf94593adf19a962dee600c871d52&ts=1774379879&refer=%2F |
| dt | BrainPOP Jr. |
| _tu | yAQ |
| en | bp_ga_event |
| _ee | 1 |
| ep.event_category | school |
| ep.event_action | subject_bpjr_click |
| ep.event_label | Science |
| ep.product | bpjr |
| ep.custom_lan | en |
| ep.url | https://jr.brainpop.com/ |
| ep.user_type | student |

***Figure 1****. Example of network traffic sent to Google when Plaintiff E.O. accessed the BrainPOP JR home page to login.*

| | |
|---|---|
| cid | 97180544.1774379879 |

…

| | |
|---|---|
| uid | eb91369e-fdb3-4536-b165-ff8ae9213720 |
| sid | 1774379880 |

…

| | |
|---|---|
| dt | Science Unit: Matter - BrainPOP Jr. |
| _tu | yAQ |
| en | bp_ga_event |
| _ee | 1 |
| ep.event_action | view_topic |
| ep.product | bpjr |
| ep.custom_lan | en |
| ep.url | https://jr.brainpop.com/unit/matter/ |

***Figure 2***. *Example of network traffic sent to Google when Plaintiff E.O. used the Website to view the lessons in the "Matter" unit. Notably, the identifiers are identical to the identifiers sent at login.*




| | |
|---|---|
| cid | 97180544.1774379879 |

…

| | |
|---|---|
| uid | eb91369e-fdb3-4536-b165-ff8ae9213720 |
| sid | 1774379880 |

…

| | |
|---|---|
| dl | https://jr.brainpop.com/topic/solids-liquids-and-gases/movie/ |
| dr | https://jr.brainpop.com/topic/solids-liquids-and-gases/ |
| sid | 1774379879 |
| sct | 1 |
| seg | 1 |
| _tu | yAQ |
| en | page_view |

***Figure 3****. Example of network traffic sent to Google when Plaintiff E.O. viewed the "Solids Liquids and Gasses" movie on BrainPOP. This is but one of more than ten transmissions to Google associated with viewing this video one time.*

| | |
|---|---|
| cid | 97180544.1774379879 |

…

| | |
|---|---|
| uid | eb91369e-fdb3-4536-b165-ff8ae9213720 |
| sid | 1774379880 |

…

| | |
|---|---|
| dl | https://www.brainpop.com/topic/newtons-laws-of-motion/movie/?assignment_id=a4b8b3fce1b324a0f4979de3452efd1c&part_id=9121bba102dd4534c1e15080c1727e30 |
| dr | https://www.brainpop.com/dashboard/assignments/a4b8b3fce1b324a0f4979de3452efd1c/periods/408f9d4c227746540e57e1c0021b443f |
| en | page_view |
| ep.page_url | https://www.brainpop.com/topic/newtons-laws-of-motion/movie/?assignment_id=a4b8b3fce1b324a0f4979de3452efd1c&part_id=9121bba102dd4534c1e15080c1727e30 |
| ep.original_page_location | https://www.brainpop.com/topic/newtons-laws-of-motion/movie/?assignment_id=a4b8b3fce1b324a0f4979de3452efd1c&part_id=9121bba102dd4534c1e15080c1727e30 |
| ep.original_page_title | BrainPOP |
| ep.url_query_string | ?assignment_id=a4b8b3fce1b324a0f4979de3452efd1c&part_id=9121bba102dd4534c1e15080c1727e30 |

***Figure 4****. Example of network traffic sent to Google when Plaintiff E.O. submitted a query to BrainPOP for a list of assignments, clicked through to an assignment on Newton's Laws of Motion, viewed the movie, and worked on the related assignment. .*

76. BrainPOP continues to disclose, and allow Google to intercept, additional details reflecting Plaintiffs' and Class Members' interactions in the password-protected student portal, including their searches and queries. For instance, when a student requests a transcript, views an

article, their class list, submission history, course calendar, or current grades from within the portal, that information is sent to Google alongside the same device and user identifiers described above.

77. Figures 5-7, below, show that BrainPOP sent even more detailed information to New Relic, including identification of when the "play movie" button was pressed.


```
host: "api.brainpop.com:443"
hostname: "api.brainpop.com"
method: "GET"
pathname: "/api/content/bpjr/topic/solids-liquids-and-gases/movie"
port: "443"
protocol: "https"
status: 200
```


***Figure 5.*** *Example of network traffic sent to New Relic while Plaintiff viewed the "Solids Liquids and Gasses" movie on BrainPOP. This is but one of many transmissions to New Relic associated with viewing the "Solids Liquids and Gasses" video one time.*


```
currentUrl: "https://jr.brainpop.com/topic/solids-liquids-and-gases/"
eventType: "UserAction"
nearestClass: "link_button"
nearestId: "play_movie"
nearestTag: "A"
pageUrl: "https://jr.brainpop.com/"
target: "html>body>div#__nuxt>div#__layout>div>div>div>div>div>main>div>div>div>div
targetClass: "link_button"
targetId: "play_movie"
targetTag: "A"
```


***Figure 6.*** *Example of network traffic sent to New Relic while Plaintiff pressed the play button for the "Solids Liquids and Gasses" movie on BrainPOP.*


```
currentUrl: "https://jr.brainpop.com/subject/reading-and-writing/"
eventType: "UserAction"
nearestClass: "card-text"
nearestId: "category_851f1953cd8bf96f473573ccbb5058b3"
```

```
currentUrl: "https://jr.brainpop.com/unit/reading-skills/"
eventType: "UserAction"
nearestClass: "text-container"
nearestId: "topic_f86dc3c4ddc0d8c88f055d2d793d67da"
```


***Figures 7.*** *Example of network traffic sent to New Relic while Plaintiff clicked through the "Reading and Writing" topic into the "Reading Skills" unit on BrainPOP..*

78. The transmissions to New Relic always include New Relic's identifiers. The transmissions also sometimes include BrainPOP's user identifier, allowing New Relic to track users across its platform. For example, when Plaintiff E.O. accessed certain pages in BrainPOP, the tracking software intercepted the user id "e5abb45664fab12230b86840b67722ea" and sent it to New Relic. By correlating this information with a browser footprint and other information, New Relic is able to correlate the BrainPOP user id with users known to New Relic.

### F. BRAINPOP DID NOT HAVE CONSENT

79. Plaintiffs and Class Members had no way of knowing that BrainPOP was disclosing and allowing third parties to intercept their private data, including sensitive educational records, when they engaged with the Website, because the Tracking Technologies were inconspicuously incorporated in code running in the background.

80. This is especially true given BrainPOP's representations that it would "solely use the Student Records for the purpose of providing and enhancing teacher and student use of the Services."[23] This language assures students that their information will remain confidential. BrainPOP's disclosure of private education records and educational video viewing histories to advertising companies through Tracking Technologies as described above violates this express promise. Maria Occhiolini, the mother of minor Plaintiffs E.O. and L.J., was not even involved in registering L.J. to use BrainPOP, and registered E.O. to use BrainPOP in circumstances inconsistent with providing informed consent.

---

[23] *Terms of Use*, BRAINPOP, https://www.brainpop.com/discover/terms-of-use (last accessed June 2, 2026) (defining "Student Records:" "Student Records are records that are directly related to a student and maintained by BrainPOP on behalf of a school or district subscriber.").

81. Based on these representations, and the inherent nature of the information, BrainPOP students and prospective students reasonably believed their private data, including educational records, would not be disclosed or used by third parties.

**G. PLAINTIFFS AND CLASS MEMBERS HAVE A REASONABLE EXPECTATION OF PRIVACY**

82. At all times when Plaintiffs and Class Members provided their private data to BrainPOP, they each had a reasonable expectation that the information would remain confidential and that BrainPOP would not share this data with third parties.

83. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before an entity collects and shares that individual's data to be one of the most important privacy rights.

84. For example, a recent *Consumer Reports* study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[24] According to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data collected about them by companies is used by companies.[25]

85. Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to

---

[24] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[25] Brook Auxier, Lee Rainie, et. al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

track users—85% of worldwide users and 94% of U.S. users chose not to share data with third parties when prompted.[26]

86. Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.[27]

87. Moreover, students are particularly concerned about data privacy with regards to student records. Indeed, one study found that students are less comfortable with their university sharing their data than they are of even Amazon sharing their data.[28] In explaining this finding, the researchers explained consumers are likely "less aware, and potentially therefore, more disturbed by, data sharing in an educational context."[29]

88. BrainPOP's disclosure of Plaintiffs' and Class Members' private communications, including private education records and video viewing histories, thus violates Plaintiff and Class Members' privacy interests.

[26] Michael Grothaus, *Apple's newest ad perfectly visualizes how App Tracking Transparency stops companies from stalking you*, FAST COMPANY (May 20, 2021), https://www.fastcompany.com/90638821/apples-newest-ad-perfectly-visualizes-how-its-app-tracking-transparency-privacy-feature-stops-companies-from-stalking-you?.

[27] *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, DATAGRAIL, (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/.

[28] *See* Maina Korir, Sharon Slade, Wayne Holmes, Yingfei Héliot, Bart Rienties, *Investigating the dimensions of students' privacy concern in the collection, use and sharing of data for learning analytics*, COMPUTERS IN HUM. BEHAV. REP'TS (March 2023).

[29] *Id*.

### H. BRAINPOP'S USE OF THE TRACKING TECHNOLOGIES VIOLATES FERPA

89. FERPA, 20 U.S.C. § 1232g, *et seq*. and its implementing regulations govern the release of and access to "education records." *See* 20 U.S.C. § 1232(g); 34 C.F.R. Part 99.

90. Under FERPA, "education records" are "those records, files, documents, and other materials which – (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

91. The term "student" includes "any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution." 20 U.S.C. § 1232(g)(a)(6).

92. Education records "include but are not limited to grades, transcripts, class lists, student course schedules, health records (at the K-12 level), student financial information (at the postsecondary level), and student discipline files."[30]

93. Under the regulations implementing FERPA, "personally identifiable information" includes, but is not limited to: (a) the student's name; (b) the name of the student's parent or other family members; (c) the address of the student or student's family; (d) a personal identifier, such as the student's social security number, student number, or biometric record; (e) other indirect identifiers such as the student's date of birth, place of birth, and mother's maiden name; (f) other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in a school community who does not have personal knowledge of the

---

[30] *What is an education record?*, UNITED STATES DEPARTMENT OF EDUCATION, https://studentprivacy.ed.gov/faq/what-education-record (last accessed Dec. 2, 2025).

relevant circumstances, to identify the student with reasonable certainty; and (g) information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the educational record relates." 34 C.F.R. 99.3.

94. Under FERPA, an educational institution or agency may not disclose personally identifiable information from a student's education records without signed and dated written consent, subject to exceptions not applicable here. *See* 34 C.F.R. 99.30-31.

95. Plaintiffs and Student Subclass Members who, like Plaintiffs, are using or have used BrainPOP as part of their publicly funded education, are students under FERPA. *See* 20 U.S.C. § 1232(g)(a)(6).

96. The information disclosed through Tracking Technologies included Plaintiffs' and Student Subclass Members status as students, assignment lists, assignment completion, and assigned video viewing histories. These details and others are education records regulated by FERPA.

97. BrainPOP's disclosure of education records alongside Plaintiffs' and Student Subclass Members' unique identifiers, like Google's "cid" identifier, without obtaining Plaintiffs' and Student Subclass Members' consent, thus constitutes a violation of FERPA.

## I. BRAINPOP'S USE OF THE TRACKING TECHNOLOGIES VIOLATES THE VIDEO PRIVACY PROTECTION ACT

98. The VPPA was passed in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

99. In passing the VPPA, Congress was particularly alarmed about surveillance of Americans' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

100. Although the VPPA was originally intended to protect the privacy of an individual's rental videotape selections, Congress has repeatedly reiterated that the VPPA is applicable to "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[31]

101. Under the VPPA, "[a] video tape service provider" is prohibited from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b).

102. The VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

103. The VPPA additionally defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

[31] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, Senate Judiciary, Subcommittee on Privacy, Technology and the Law (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

104. Defendant is inarguably a video tape service provider under the meaning of the VPPA. "At the heart of every BrainPOP lesson is a movie."[32] Accordingly, Defendant's disclosure of the specific videos viewed by students on the Platform, including its disclosure of the videos viewed by minor Plaintiffs E.O. and L.J., constitutes a violation of VPPA. The videos it provides are "similar audio-visual materials" to "pre-recorded video cassette tapes." *See*, *e.g.*, *Fan v. NBA Props. Inc*., No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**J. BRAINPOP'S USE OF THE TRACKING TECHNOLOGIES VIOLATES THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998**

105. Congress passed COPPA in 1998 to codify the societal expectations of privacy with regards to minor children's usage of the Internet. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[33]

106. COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1. Moreover, COPPA specifically prohibits "an operator of a website or online service…[from] collect[ing] personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission ("FTC")]" where the website or online service is "directed to

---

[32] *See Grades 3-8*, supra n.10.

[33] *Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sep. 9, 2019), *available online at*: https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf.

children" or the website operator "has actual knowledge that it is collecting personal information from a child[.]" 15 U.S.C. § 6502.

107. When passed in 1998, COPPA defined "personal information" as meaning:

> individually identifiable information about an individual collected online, including--(A) a first and last name; (B) a home or other physical address including street name and name of a city or town; (C) an e-mail address; (D) a telephone number; (E) a Social Security number; (F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or (G) information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph.

15 USCS § 6501 (1998).

108. Then, in 2013, COPPA was enhanced, and its definition of "personal information" was widened to explicitly include "persistent identifier[s] that can be used to recognize a user over time and across different Web sites or online services" including "customer number[s] held in a cookie," "Internet Protocol (IP) address[es]," "processor or device serial number[s]," and "unique device identifier[s.]" 16 C.F.R. § 312.2.

109. To comply with COPPA, website operators collecting information from children must:

> provide notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information; and … obtain verifiable parental consent for the collection, use, or disclosure of personal information from children[.]

15 U.S.C. § 6502(b)(1)(A).

110. In order to determine whether a website or online service is "directed to children" the FTC considers the website's:

> subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child

> celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

111. The Website is obviously "directed to children" under the meaning of COPPA, as it consists of movies explicitly produced for a child audience, to educate children, and hosted by Defendants on portions of the website directed towards children.

112. Accordingly, Defendants' collection and disclosure of personally identifiable information without obtaining parental permission from minor users of the Platform, like Plaintiffs' Children, constitutes a violation of COPPA.

### K. PLAINTIFFS' DATA HAS VALUE & BRAINPOP WAS UNJUSTLY ENRICHED

113. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

114. Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid individuals $20 a month to collect browsing history information and other communications.

115. The education-based data BrainPOP disclosed is particularly valuable. Educational institutions spend approximately $200 per lead ("CPL") when advertising to attract prospective students to attend their institution.[34] Data about these high value leads are also extremely valuable

[34] Patrick Van Gorder, *Higher education lead generation in 2025: Reimagining pay-per-lead strategies*, LEVEL, https://www.level.agency/perspectives/higher-education-lead-generation-ppl-strategies/#:~:text=According%20to%20a%20panel%20discussion%2C%20the%20average,bidding%20strategies**%20*%20**Students%20are%20increasingly%20self%2Ddirected** (last visited January 26, 2026).

to Google as it seeks to attract more companies to its services, and broaden its profiles about specific individuals. The information disclosed by BrainPOP makes Google's data even more detailed and valuable, as it obtains detailed information about children during their formative years.

116. According to Meta, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[35]

117. Notably, advertisers have specific advertising functions to target students who attended particular institutions, based on their highest level of education, and educational focus—all information BrainPOP gives Google.[36] This too confirms the type of PII and education data BrainPOP disclosed has objective market value.

118. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

119. Consumers' data becomes less valuable when it is widely available. If multiple entities each possess the same data about an individual consumer, those entities will have to compete to sell that data, lowering its price.

[35] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[36] *Advanced Targeting*, META, https://developers.facebook.com/docs/marketing-api/audiences/reference/advanced-targeting/? (last visited January 26, 2026).

120. The unauthorized disclosure of Plaintiffs' and Class Members' private data through Tracking Technologies has diminished the value of that information, resulting in harm including to Plaintiffs and Class Members.

121. Had Plaintiffs or Class Members known of BrainPOP's disclosure of private information to third parties and its misappropriation and misuse of such data, they would have expected BrainPOP to be paid less for its services and/or expected renumeration for the value of their data BrainPOP's services. In particular, students using BrainPOP as part of their public school curriculum would not expect to need to give up their right to privacy to receive their constitutionally guaranteed right to an education.

122. On the other hand, BrainPOP obtained unjust benefits as a result of its conduct, including (1) targeted advertising services and marketing on third-party platforms; (2) advanced analytics they otherwise would not have access to; and (3) the valuable data itself.

## V. TOLLING AND ESTOPPEL

123. Any applicable statutes of limitation have been tolled by BrainPOP's knowing and active concealment of the incorporation of the Tracking Technologies onto the Website.

124. The Tracking Technologies on the Website were and are invisible to the average website visitor.

125. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover BrainPOP's deception and unlawful conduct.

126. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

127. BrainPOP had exclusive knowledge that the Website incorporated the Pixels and other Tracking Technologies and yet failed to disclose to students, including Plaintiffs and Class

Members, that by using the Website, Plaintiffs' and Class Members' sensitive information would be disclosed or released to unauthorized third parties, including Google and New Relic.

128. Under the circumstances, BrainPOP was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its students' sensitive information. In fact, to the present, BrainPOP has not conceded, acknowledged, or otherwise indicated to their students that they have disclosed or released their sensitive information to unauthorized third parties. Accordingly, BrainPOP is estopped from relying on any statute of limitations.

129. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

130. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered BrainPOP's conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

131. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

132. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

> All natural persons in the United States and its territories who used the Website, and whose private information was disclosed or transmitted to Google, New Relic, or any other Unauthorized Third Party via the Tracking Technologies.

133. Plaintiffs also assert claims on behalf of, at least, the following subclasses:

**Student Subclass**

> All natural persons who were provided access to the Website as part of their publicly funded education, who used the Website as part of their publicly funded

education, and whose private information was disclosed or transmitted to Google, New Relic, or any other Unauthorized Third Party via the Tracking Technologies.

**Current Student Subclass**

All natural persons who were provided access to the Website as part of their publicly funded education, who are currently using the Website as part of their publicly funded education, and whose private information was disclosed or transmitted to Google, New Relic, or any other Unauthorized Third Party via the Tracking Technologies.

**Pennsylvania Subclass**

All natural persons in the United States and its territories who used the Website while located in Pennsylvania, and whose private information was disclosed or transmitted to Google, New Relic, or any other Unauthorized Third Party via the Tracking Technologies during the course of such use.

134. For purposes of these class definitions, an "Unauthorized Third Party" is any third party which either 1) was not contractually obligated to use private information intercepted and disclosed by BrainPOP only as BrainPOP's agent and solely to advance BrainPOP's interests, or 2) used private information intercepted and disclosed by BrainPOP other than as BrainPOP's agent in a manner solely to advance BrainPOP's interests.

135. Excluded from the proposed Class and Subclasses are any claims for wrongful death or other property damage sustained by the Class; BrainPOP and its parents or subsidiaries; any entities in which BrainPOP has a controlling interest; BrainPOP's officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; anyone employed by counsel in this action; any judge to whom this case is assigned, any such judge's spouse and immediate family members; and members of the judge's staff.

136. Plaintiffs reserve the right to amend the definitions of the Class or Subclasses, and add additional classes, if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

137. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. On information and belief, there are thousands of individuals that have been impacted by BrainPOP's actions. The identity of such membership is readily ascertainable from BrainPOP's records and the third parties whose Tracking Technologies BrainPOP incorporated on the Website.

138. **Commonality.** Common questions of law or fact arising from BrainPOP's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendants had a duty to protect the Private Children's Data of Plaintiffs' Children and Class Members;

b) Whether Defendants had duties not to disclose the Private Children's Data of Plaintiffs' Children and Class Members to unauthorized third parties;

c) Whether Defendants violated their own privacy policy by disclosing the Private Children's Data of Plaintiffs' Children and Class Members to third parties, including Google and Microsoft, without obtaining the parents' consent;

d) Whether Defendants did and/or could have obtained sufficient consent to permit tracking of Plaintiffs' Children and Class Members.

e) Whether Defendants adequately, promptly, and accurately informed Plaintiffs, Plaintiffs' Children, and Class Members that the Private Children's Data would be disclosed to third parties;

f) Whether Defendants violated the law by failing to promptly notify Plaintiffs, Plaintiffs' Children, and Class Members that the Private Children's Data was being disclosed without their consent;

g) Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of Plaintiffs' Children and Class Members' Private Children's Data;

h) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Children's Data belonging to Plaintiffs' Children and Class Members free from unauthorized disclosure;

i) Whether Defendants violated the statutes asserted as claims in this Complaint;

j) Whether Plaintiffs' Children, and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

k) Whether Defendants knowingly made false representations as to their data security and/or privacy policy practices;

l) Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

m) Whether Plaintiffs and Current Student Subclass Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Private Children's Data.

139. **Typicality.** Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs used the Website and had their personal identifiable information and private data disclosed to third parties without their express written authorization or knowledge. All Class Members suffered the same harm as a result of the same conduct. And Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

140. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not

antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

141. **Predominance**. BrainPOP has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully disclosed to unauthorized third parties, and used, in the same way. The common issues arising from BrainPOP's conduct affecting Class Members, set out above, predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for BrainPOP. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### COMMON LAW INVASION OF PRIVACY
***(On Behalf of Plaintiffs and the Nationwide Class)***

143. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

144. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with BrainPOP on the Website. This includes an interest in: (1) controlling the dissemination and use of their sensitive, personal information entered on these web properties; and (2) conducting their private affairs without observation, intrusion or interference, including, but not limited to, the right to visit and interact with Website without being subjected to the exfiltration of their communications without consent.

145. Plaintiffs and Class Members communicated sensitive and protected educational information that was individually identifiable to BrainPOP, including on login-protected pages and student portals. These communications were intended only for BrainPOP and Plaintiffs and Class Members understood and reasonably expected BrainPOP to keep these communications private.

146. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, education information, video viewing histories, and other data would remain confidential, and that BrainPOP would not install Tracking Technologies on the Website to secretly transmit their communications to unauthorized third parties.

147. This expectation of privacy is especially heightened given BrainPOP's consistent representations to users that this information would be safeguarded and that consumers had control over which information was shared and used. For instance, BrainPOP promised it would *not* disclose this information without express consent, as this information is protected by FERPA and

COPA. BrainPOP thus did not have express consent or authorization to transmit Plaintiffs' private information to Google, New Relic, or other third parties, yet nonetheless engaged in this conduct.

148. BrainPOP's disclosure of the substance and nature of Plaintiffs' and Class Members' communications to third parties through the Tracking Technologies incorporated on the Website without their knowledge and consent is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

149. BrainPOP's disclosure and use of Plaintiffs' and Class Members' private data, coupled with individually identifying information, is highly offensive to the reasonable person. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared. Reasonable people would be highly offended to know BrainPOP disclosed identifiable, private student records to one of the largest advertising companies in the world, and that Google now has Plaintiffs' and Class Members' private data and uses this information for its own benefit.

150. As a result of BrainPOP's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

151. Plaintiffs and Class Members have been damaged as a direct and proximate result of BrainPOP's invasion of their privacy and are entitled to compensatory and/or nominal damages.

152. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

153. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of BrainPOP's actions, directed at injuring Plaintiffs

and Class Members in conscious disregard of their rights. Such damages are needed to deter BrainPOP from engaging in such conduct in the future.

154. Plaintiffs also seek such other relief as the Court may deem just and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (“ECPA”) 18 U.S.C. § 2510, *et seq.*
***(On Behalf of Plaintiffs and the Nationwide Class)***

155. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

156. The ECPA prohibits, among other things, (1) intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication; and (2) intentionally disclosing or endeavoring to disclose, or intentionally using or endeavoring to use, the contents of any the above communications knowing or having reason to know the information was obtained through an interception of a wire, oral, or electronic communication.[37]

157. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119. 18 U.S.C. § 2520(a).

158. The ECPA defines “electronic communications” to mean the “transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce.” The transmissions of data between Plaintiffs and Class Members and BrainPOP through the Website qualify as “communications” under the ECPA’s definition of 18 U.S.C. §

[37] The ECPA lists other circumstances where such use or endeavor to use violate the ECPA but are not listed here for brevity.

2510(12). The intercepted communications include, but are not limited to, communications to and from Plaintiffs and Class Members regarding their searches, queries, and FERPA-protected student records.

159. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

160. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

161. ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The Tracking Technologies, BrainPOP's web server, and Plaintiffs' devices and browsers constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

162. Here, BrainPOP intentionally and willingly facilitated, and procured third parties to intercept and use, the contents of Plaintiffs' and Class Members' private communications by embedding the Tracking Technologies on the Website. BrainPOP has full control over the Tracking Technologies, including which webpages incorporate this technology and what communications are intercepted and by whom.

163. BrainPOP disclosed, used, and allowed third parties to use the content of Plaintiffs' and Class Members' private communications, including their private searches, queries, and the substance of their educational records knowing the information was obtained through an unlawful interception through the Tracking Technologies embedded on the Website.

164. By utilizing and embedding the Tracking Technologies, BrainPOP aided, endeavored, and provided another person to intercept and use the content of Plaintiffs' and Class Members' communications in violation of the ECPA.

165. This conduct violates, at a minimum, 18 U.S.C. § 2511(1)(a), 18 U.S.C. § 2511(1)(c), and 18 U.S.C. § 2511(1)(d).

166. The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication, and so they are used in real-time to begin identifying and tracking the actions of individual consumers. As a result, the communications were intercepted and used in transit before reaching their final resting point.

167. In engaging in the above conduct, BrainPOP acted with a tortious and criminal purpose, and intended to violate state and federal constitutional and statutory provisions, including:

a) A knowing intrusion upon Plaintiffs' and Class Members' seclusion;

b) The intentional disclosure of private facts;

c) Violation of various state computer privacy and property statutes, including but not limited to the Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA");

d) Breach of Implied Contract;

e) Violations of FERPA, 20 U.S.C. § 1232g, *et seq*.;

f) Violations of the Video Privacy Protection Act, VPPA

168. The unauthorized disclosure and use of private communications—and endeavoring and procuring others to intercept and use such information—for profit is tortious in and of itself. BrainPOP disclosed and used these communications with knowledge that it represented these communications would remain private, but put its desire and purpose of maximizing its own profits

above the needs, expectations, and privacy rights of Plaintiffs' and Class Members. Thus, BrainPOP's conduct was especially tortious.

169. BrainPOP is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their sensitive information on the Website, because it used its participation in these communications to improperly and tortiously share Plaintiffs' and Class Members' Private Information with Google and other third-parties (a) that did not participate in these communications, (b) that Plaintiffs and Class Members did not know were receiving their sensitive information, and (c) that Plaintiffs and Class Members did not consent receiving unrestricted receipt of their sensitive information.

170. Plaintiffs and Class Members seek all available relief for these violations, including statutory damages, punitive damages in an amount to be determined by a jury, and reasonable attorneys' fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

## **THIRD CLAIM FOR RELIEF**
## **VIOLATIONS OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("WESCA"), 18 PA. C.S. § 5701, *et seq*.**
***(On Behalf of Plaintiffs and the Pennsylvania Subclass)***

171. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

172. 18 PA. C.S. § 5703 provides that it is a criminal act if a person "(1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication; (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom,

knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication."

173. 18 PA. C.S. § 5747(a) provides for a civil cause of action, whereupon the aggrieved person may, "in a civil action, recover from the person or entity which engaged in the violation such relief as may be appropriate."

174. WESCA defines "intercept" as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 PA. C.S. § 5702. And "contents" is broadly defined as "any information concerning the substance, purport, or meaning of that communication." The use of the Tracking Technologies to immediately transmit, in real time, the substance of Plaintiffs' and Class Members' communications constitutes an "intercept[ion]."

175. WESCA defines "electronic, mechanical, or other device" as "any device or apparatus … that can be used to intercept a telecommunication or oral communication …" 18 PA. C.S. § 5702.[38] Plaintiffs' and Class Members' browsers and devices, BrainPOP's web server, and the Tracking Technologies at issue each constitute a "device" within the meaning of WESCA.

176. By utilizing and embedding the Tracking Technologies on the Website, BrainPOP willfully intercepted, endeavored to intercept, and procured another person to intercept, the telecommunications of Plaintiffs and Class Members, in violation of WESCA.

177. Specifically, BrainPOP intercepted Plaintiffs' and Class Members' telecommunications via the Tracking Technologies, which tracked, intercepted, and unlawfully disclosed Plaintiffs' and Class Members' sensitive information to third parties such as Google and New Relic to use for their own purposes. The intercepted communications include, but are not

[38] The definition also includes exceptions not applicable here.

limited to, communications to and from Plaintiffs and Class Members regarding their FERPA-protected student records and VPPA protected video viewing histories.

178. By willfully disclosing or endeavoring to disclose the telecommunications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of telecommunications, BrainPOP violated 18 PA. C.S. § 5703(2).

179. By willfully using, or endeavoring to use, the contents of the telecommunications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of a telecommunication, BrainPOP violated BrainPOP violated 18 PA. C.S. § 5703(3).

180. BrainPOP was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

181. BrainPOP did not obtain consent from Plaintiffs or Class Members prior to intercepting their telecommunications, but WESCA requires "all parties to the communication" to give prior consent to any interception. 18 PA. C.S. § 5704(4). Any purported consent that BrainPOP may claim to have received from Plaintiffs and Class Members was not valid.

182. As a result of BrainPOP's violation of the New Hampshire Wiretap Act, Plaintiffs and Class Members are entitled to all damages available under 18 PA. C.S. § 5725(a), including actual damages but not less than liquidated damages computed at a rate of $100 per day for each day of violation or $1,000, whichever is higher; punitive damages; reasonable attorney's fees and other reasonable litigation costs incurred.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Nationwide Class)***

183. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

184. Plaintiffs and Class Members conferred a benefit on BrainPOP in the form of valuable private information, including education records and video viewing histories, that BrainPOP collected from Plaintiffs and Class Members. BrainPOP collected, used, and disclosed this information to third parties, including at least Google and New Relic, for its own gain, including for advertising, analytics, and marketing purposes.

185. BrainPOP knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it, including using this unlawfully disclosed information to identify "lookalikes" that could be converted from potential to actual students through targeted advertising.

186. Plaintiffs and Class Members also conferred a benefit on BrainPOP in the form of tuition and fees for its education services.

187. Plaintiffs and Class Members would not have provided their valuable private and education information to BrainPOP or paid for BrainPOP's services if they had known BrainPOP was disclosing their private data to third parties and using it for its own gain.

188. BrainPOP unjustly retained these benefits at the expense of Plaintiffs and Class Members. BrainPOP did not provide any commensurate compensation to Plaintiffs and Class Members in exchange for its disclosure of their private information for its own gain.

189. The benefits that BrainPOP derived from Plaintiffs and Class Members' private and education information rightfully belong to Plaintiffs and Class Members. It would be inequitable

under unjust enrichment principles for BrainPOP to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. It would also be inequitable for BrainPOP to retain the subscription fees paid to BrainPOP by or on behalf of Plaintiffs and Class Members for its services as BrainPOP obtained them through its unfair and unconscionable trade practices.

190. BrainPOP should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that BrainPOP received from them, and such other relief as the Court may deem just and proper.

191. There is no remedy at law that will address this harm as monetary damages for legal claims will not capture or account for the wrongful profit or benefit that BrainPOP received from exploiting Plaintiffs and Class Members' data.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE**
***(On Behalf of Plaintiffs and the Nationwide Class)***
***(in the Alternative)***

192. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

193. While BrainPOP's conduct was by all appearances intentional, it was at the very least (and in the alternative) negligent.

194. BrainPOP is an educational institution whose students and prospective students, including Plaintiffs and Class Members, entrust with their sensitive personal and education information in connection with using BrainPOP's Properties.

195. Through their use of the Website to complete coursework and to watch educational videos, Plaintiffs and Class Members provided BrainPOP with their private data, believing such Information would be kept confidential. By collecting and storing this data, BrainPOP had a duty

of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

196. Additionally, given the highly sensitive nature of the personal and education information, and likelihood of harm resulting from its unauthorized disclosure, multiple statutes, regulations, and guidelines, including FERPA, the VPPA, and COPPA, in addition to the common law, impose a duty on BrainPOP to protect this information.

197. BrainPOP also had a duty of care because of the special relationship that existed between BrainPOP and its students and prospective students. BrainPOP was the only party in a position to ensure that it was sufficiently protecting Plaintiffs and Class Members' sensitive personal information, including education information, from unauthorized disclosure to third parties, including Google and New Relic.

198. BrainPOP breached its duty to exercise reasonable care in protecting Plaintiffs and Class Member's sensitive personal information, including education information and video viewing histories, when it disclosed this information without authorization to third parties to use for their own benefit.

199. BrainPOP also breached its duty by failing to disclose to Plaintiffs and the Class that it would use their private information for marketing purposes, and/or that such private data would be transmitted to third parties.

200. It was foreseeable to BrainPOP that the unauthorized disclosure of Plaintiffs and Class Members' sensitive personal information, including education information, could result in injury to its students and prospective students.

201. As a direct and proximate result of BrainPOP's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

202. BrainPOP's conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable sensitive information accessed, stored, and disseminated without their knowledge or consent.

203. BrainPOP's conduct is ongoing in that it still discloses Plaintiffs' and Class Members' private data through present. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief, in addition to compensatory, nominal, and/or punitive damages.

**SIXTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
***(On Behalf of Plaintiffs and the Nationwide Class)***

204. Plaintiffs repeat and reallege the allegations contained in foregoing paragraphs as if fully set forth herein.

205. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1).

206. "Personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

207. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

208. Defendants are both a "video tape service provider" because their primary business is the production, hosting, and streaming of thousands of videos on the Platform (as well as through other mediums), thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

209. Defendants violated the VPPA by knowingly disclosing Plaintiffs' Children's and Class Members' personally identifiable information to Google and Microsoft through the Tracking Tools without obtaining informed, written consent.

210. As a result of Defendants' violation of the VPPA, Plaintiffs and the Class are entitled to all damages available under the VPPA including declaratory and equitable relief, statutory damages of $2,500 for each violation of the VPPA, attorney's fees, filing fees, and costs, and as to Plaintiffs Rodriguez and Rader's Children's and Class Members' continued use of the Platform, injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
***(On Behalf of Plaintiffs and the Nationwide Class)***

211. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

212. BrainPOP entered into agreements with Plaintiffs and Class Members in offering use of the Website.

213. BrainPOP's privacy representations formed a part of the contract between BrainPOP and Plaintiffs and Class Members.

214. In light of these promises, which were used to persuade Plaintiffs and Class Members use BrainPOP, including using the Website, BrainPOP owed a contractual duty to Plaintiffs and the Class to honor their pledges and privacy assurances.

215. BrainPOP breached this agreement because (1) it disclosed Plaintiffs' and Class Members' private data, including identifiable student records; (2) it allowed third parties to use Plaintiffs' and Class Members' private data for their own benefit, including serving targeted ads; and (3) it reaped the benefits from its unlawful disclosure of Plaintiffs' and Class Members' private data, including improved advertising and monitoring capabilities.

216. As a direct and proximate result of BrainPOP's breach of contract, Plaintiff and Class Members sustained actual losses and damage as alleged herein, including (1) that they did not receive the benefits of the bargains for which they paid BrainPOP or for which BrainPOP was paid on their behalf, and (2) suffered privacy harms.

217. Plaintiffs and Class Members seek compensatory damages, consequential damages in an amount to be proven at trial, and declarative, injunctive, or other equitable relief that may be appropriate. Plaintiffs and Class Members alternatively seek an award of nominal damages.

## EIGHTH CLAIM FOR RELIEF
## BREACH OF IMPLIED CONTRACT
***(On Behalf of Plaintiffs and the Nationwide Class)***
***(Pled in the Alternative to Breach of Contract)***

218. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1-210 as if fully set forth herein.

219. When Plaintiffs and Class Members provided their private data to BrainPOP in their use of the Website to view educational videos and, for the Student Subclass, when they used BrainPOP to complete assigned coursework, they entered into an implied contract pursuant to which BrainPOP agreed to safeguard and not disclose their private data without consent.

220. BrainPOP solicited and invited Plaintiffs and Class Members to use the Website as part of their business practices. This included communicating with BrainPOP on the Website, which were expected to remain private.

221. Plaintiffs and Class Members would not have entrusted BrainPOP with their private data in the absence of an implied contract between them and BrainPOP obligating BrainPOP to not disclose it without consent.

222. BrainPOP breached these implied contracts by disclosing Plaintiffs' and Class Members' private data to third parties like Google and New Relic.

223. Plaintiffs and Class Members would not have used BrainPOP's services, would have paid substantially less for those services, would have expected BrainPOP to be paid substantially less on their behalf, or would have expected renumeration for BrainPOP's use of their private data, had they known their private data would be disclosed.

224. As a direct and proximate result of BrainPOP's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

225. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of BrainPOP's breaches of implied contract.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against BrainPOP as follows:

A. an Order certifying the Nationwide Class, the Student Subclass, the Current Student Subclass, and the Pennsylvania Subclass, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining BrainPOP from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the sensitive information of Plaintiffs and Members of the Current Student Subclass;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Current Student Subclass Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

Dated: June 12, 2026

Respectfully submitted,

*/s/ Alexander Garcia*
Alexander Garcia
**SIRI & GLIMSTAD LLP**
1650 Market St., Ste. 3600 #17136373
Philadelphia, PA 19103
Tel: (212) 532-1091
E: agarcia@sirillp.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Zane A. Johnson*
**SIRI & GLIMSTAD LLP**
100 Pearl Street, 14th Floor - # 16946876
Hartford, CT 06103
Tel: (212) 532-1091
E: zjohnson@sirillp.com

**pro hac vice admission granted or anticipated*

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: June 12, 2026

Respectfully submitted,

*/s/ Alexander Garcia*